UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DAVID SCOTT PEASLEY,<br><br>Plaintiff,<br><br>v.<br><br>ZAHED AHMED and MARIA LOPEZ,<br><br>Defendants. | Case No. 15-CV-01769-LHK<br><br>**ORDER DENYING PLAINTIFF'S MOTION TO AMEND OR ALTER JUDGMENT; MOTION FOR RECONSIDERATION; AND MOTION FOR A NEW TRIAL**<br><br>Re: Dkt. Nos. 330, 331, 332, 343, 345, 354, 362, 369 |

Plaintiff David Scott Peasley ("Plaintiff") brought deliberate indifference claims against Defendants Zahed Ahmed ("Ahmed") and Maria Lopez ("Lopez") (collectively, "Defendants"). After a jury trial on Plaintiff's claims, the jury found for Defendants. ECF No. 321. Before the Court are Plaintiff's motions to amend or alter judgment, for reconsideration, and for a new trial. Having considered the parties' submissions, the relevant law, and the record in this case, the Court DENIES Plaintiff's motions to amend or alter judgment, for reconsideration, and for a new trial.

## I. BACKGROUND

### A. Factual Background

Plaintiff has been incarcerated in the California state prison system since 2010. Tr. at

1

ORDER DENYING PLAINTIFF'S MOTION TO AMEND OR ALTER JUDGMENT; MOTION FOR
RECONSIDERATION; AND MOTION FOR A NEW TRIAL

165:12-14. Plaintiff testified at trial that he was diagnosed with Type 1 diabetes at age ten. *Id.* at 164:14-19. Diabetes is a condition characterized by blood sugars of over 125 milligrams per deciliter ("mg/dl"). *Id.* at 519:11-20. The state of having high blood sugar levels is called hyperglycemia, whereas the state of having low blood sugar levels is called hypoglycemia. *Id.* at 335:18-336:1.

Plaintiff has brittle diabetes, which means that Plaintiff's blood sugar levels fluctuate: "Mr. Peasley's blood sugars are somewhat unpredictable. They vary widely. And that's called brittle diabetes." *Id.* at 532-17-18; *see also id.* at 436:11-14 (Plaintiff's expert testifying that people with brittle diabetes are "tough to manage because you have to get the insulin dosing just right"). Consuming glucose can also increase a person's blood sugar levels. *Id.* at 335:15-17.

Ordinarily, a person's body produces insulin to regulate and reduce blood sugar levels. *Id.* at 335:9-12. However, a Type 1 diabetic like Plaintiff cannot produce insulin. *Id.* at 436:2-7. In Type 2 diabetes, the patient can produce insulin, but his body is insulin resistant. *Id.* at 435:5-13. To manage blood sugar levels, a Type 1 diabetic receives insulin injections. Tr. at 436:4-7. There are two types of insulin. Base insulin, also referred to as Glargine, releases slowly throughout the body and more gradually reduces blood sugar levels. *Id.* at 419:1-3. Base insulin is typically administered between meals. *Id.* at 437:3-6. By contrast, regular insulin, also referred to as Humulin, more quickly releases to reduce blood sugar levels, and is typically administered at mealtimes to modulate the glucose in food the patient consumes. *Id.* at 419:6-10; 437:7-14.

If a person with diabetes does not receive sufficient insulin, he can develop diabetic ketoacidosis ("DKA"), as Defendants' medical expert testified: "Ketoacidosis is usually found in Type 1 diabetics who have insulin deficiency." *Id.* at 556:10-11. Plaintiff's medical expert testified that DKA is a condition wherein "the liver comes up with an ingenious strategy to produce something called a ketone body, and the ketone bodies can be used like glucose, not as well as glucose, but like glucose, by the brain." *Id.* at 440:9-12. Ketones are acidic, and "once the blood becomes too acidic and the ketone levels rise too much, people start gaining symptoms and

2

symptoms and symptoms on top of one another leading to what we really refer to as severe diabetic coma, or severe diabetic ketoacidosis. These individuals need emergent care or they will die imminently if they're not dealt with in an emergent manner." *Id.* at 438:20-25. Symptoms of ketoacidosis include dehydration, abdominal symptoms like pain and nausea, frequent breathing, fruity breath, muscular weakness, cognitive issues, and death. *Id.* at 557:10-558:24.

During the events in question, Plaintiff was incarcerated at Correctional Training Facility ("CTF") in Soledad, California. *Id.* at 165:23-25. Plaintiff was transferred to CTF in January 2013. *Id.* at 166:9-11. Defendant Ahmed is a medical doctor in the prison system and was Plaintiff's primary care physician during Plaintiff's incarceration at CTF. *Id.* at 274:14-275:12. Defendant Lopez was a corrections officer at CTF. *Id.* at 263:4-6.

**1. Defendant Ahmed Altered Plaintiff's Insulin Regimen in May 2013**

Plaintiff's claim against Defendant Ahmed stems from Defendant Ahmed's alteration of Plaintiff's insulin regimen in May 2013, a few months after Plaintiff arrived at CTF. At trial, the parties presented the below evidence related to Defendant Ahmed's treatment of Plaintiff.

Throughout his incarceration at CTF, Plaintiff received insulin injections multiple times daily from nurses at the "pill window." Tr. at 253:3-17; *see* Ex. 1-1 (image of pill window). Medical staff also tested Plaintiff's blood sugar at mealtimes and occasionally at bedtime. Tr. at 253:3-7. When Plaintiff arrived at CTF, Plaintiff was receiving two doses of base insulin each day—one dose of 23 units in the morning and one dose of 15 units in the evening. Ex. 323 at 1. Plaintiff also received doses of regular insulin with breakfast (15 units), lunch (12 units), and dinner (19 units). *Id.* Finally, Plaintiff received additional doses of regular insulin at meals and at bedtime, with the precise dosages varying based on Plaintiff's blood sugar readings. *Id.* These varying doses are referred to as "sliding scale" insulin. *Id.*; *see also* Tr. at 170:15-19 (Plaintiff testifying that he received regular insulin on a sliding scale basis).

On April 17, 2013, Plaintiff first met with Defendant Ahmed, according to Defendant Ahmed's notes. Ex. 3-2. Defendant Ahmed testified that at the first appointment with Plaintiff,

Defendant Ahmed maintained Plaintiff's existing regimen: "I followed the previous thing and I intake, I examined him. That's my first encounter." Tr. at 279:12-15. On May 9, 2013, Ahmed referred Plaintiff to a diabetes educator. Ex. 8-4.

On May 21, 2013, Defendant Ahmed had another appointment with Plaintiff, and first adjusted Plaintiff's insulin regimen. Defendant Ahmed increased Plaintiff's evening dose of base insulin from 15 units to 18 units. ECF No. 323 at 2. Defendant Ahmed also increased Plaintiff's breakfast dose of regular insulin from 15 units to 18 units and reduced Plaintiff's dinner dose of regular insulin from 19 units to 15 units. *Id.* Defendant Ahmed continued to provide Plaintiff sliding scale regular insulin at meals and bedtime. *Id.*

Plaintiff testified that he requested the adjustments because of environmental differences at CTF: "The meals, the structure of the exercise times, et cetera, were different. So very minute modifications were needed." Tr. at 178:13-15. Similarly, Defendant Ahmed testified that he adjusted Plaintiff's insulin regimen in response to Plaintiff's complaints "that his blood sugar is going higher in the morning and then evening it lowered, so he wanted to adjust it." *Id.* at 284:11-13. Defendant Ahmed testified that he was concerned about Plaintiff's low blood sugar readings, and possible episodes of hypoglycemia: "But here I saw something going wrong because the nurse is recording it and they're reporting to me that he's showing episodes of hypo, low, sugar. Very dangerous. I have short time to bring him in and treat it." *Id.* at 287:14-17. Indeed, Plaintiff's blood sugar levels varied widely, and were occasionally very low. For example, on May 15, 2013, Plaintiff's blood sugar was at 60 mg/dl in the morning, at 98 mg/dl at lunch, and at 81 mg/dl in the evening. Ex. 4-76. On May 18, 2013, Plaintiff's blood sugar fluctuated from 119 mg/dl in the morning to 198 mg/dl at lunch to 60 mg/dl in the evening. *Id.*

Thus, on May 23, 2013, Defendant Ahmed again adjusted Plaintiff's insulin regimen. Specifically, Defendant Ahmed increased Plaintiff's dose of morning base insulin from 23 units to 30 units, and his evening base insulin from 18 units to 25 units. ECF No. 323 at 3. Defendant Ahmed also removed standing doses of regular insulin from mealtimes. *Id.* However, Defendant

4

Ahmed continued to provide Plaintiff regular insulin on a sliding scale at mealtimes. *Id.* Thus, as Defendant Ahmed explained, Plaintiff continued to receive regular insulin, although the doses depended on Plaintiff's blood sugar levels: "Sliding scale means giving insulin if blood sugar is high, to give higher dose. If it's low, to give lower dose." Tr. at 418:9-10.

Defendant Ahmed testified that he adjusted Plaintiff's insulin regimen because he thought that given Plaintiff's low blood sugar readings, "possibly [Plaintiff] was receiving excess of insulin." *Id.* at 292:23-24. In addition, Defendant Ahmed testified that nurses informed Defendant Ahmed that Plaintiff had not been injecting all of his prescribed insulin: "Nurse's note, I depend on also. Yeah, they mention he is squirting insulin, and he's taking insulin unknown amount." *Id.* at 293:21-23; *see also* Ex. 28 (Defendant Ahmed's May 15, 2013 note noting that Plaintiff "continues to 'waste' predrawn insulin" and "argues MD's orders are correct on a daily bases [sic]"). Plaintiff conceded at trial that Plaintiff would not always inject the prescribed insulin: "I would measure a reduction of, say, 2 units." Tr. at 253:22-23.

Accordingly, Defendant Ahmed testified that he worried that Plaintiff was not complying with the existing treatment plan: "Diabetes is the whole approach. He was – he was not complying with medicine. Sometimes he is missing the whole amount of the lantus, the long lasting [base] insulin." *Id.* at 295:7-10. Defendant Ahmed testified that he decided to give Plaintiff regular insulin on a sliding scale rather than on a standing basis to determine the optimal amount of insulin for Plaintiff: "Sliding scale usually will do to find out what is the amount he need." *Id.* at 422:13-14.

After the May 23, 2013 adjustment, Plaintiff completed several health care request forms, some disputing the insulin regimen and others related to other health care requests. For example, on May 23, 2013, Plaintiff stated on a form: "Per Dr. Ahmed, I wish to get a consult. Discussion of cognitive functions." Ex. 310. Defendant Ahmed referred Plaintiff to a mental health professional, and on May 31, 2013, Plaintiff met with Dr. J. Pazdernik. Ex. 8-5. Defendant Ahmed testified that he thought the mental health appointment was worthwhile to address

Plaintiff's noncompliance with Defendant Ahmed's recommended treatment: "We want mental health evaluation because of the, of his noncompliance." Tr. at 382:19-20.

On May 24, 2013, Plaintiff complained about the new insulin regimen: "Insulin not allowed and blood test is denied." Ex. 312. On May 28, 2013, Plaintiff complained about Defendant Ahmed's decision to stop providing standing doses of regular insulin: "Long term insulin doesn't control sugar levels fast enough so I can't eat. Records indicate specialist agree to use fast insulin to cover meals." ECF No. 313. On June 2, 2013, Plaintiff asked to see a diabetic specialist. Exs. 314, 315. Plaintiff testified at trial that after the regimen change "it was hard to walk. It was very life changing." Tr. at 188:1-2. However, Plaintiff conceded that in his many health care request forms, Plaintiff never mentioned the term ketoacidosis nor any symptom of ketoacidosis other than high blood sugar levels. *Id.* at 235:2-240:24. For example, Plaintiff conceded that he did not mention ketoacidosis or any of its symptoms on the June 2, 2013 health care request form, Ex. 314:

> **Q**: And did you mention the term "ketoacidosis" on that form?
> **A**: I did not, sir.
> **Q**: Did you mention any of the symptoms of ketoacidosis on this form, such as abdominal pain?
> **A**: On that form, no, sir.

*Id.* at 235:7-13.

After the insulin regimen change, Plaintiff's blood sugar levels continued to fluctuate. On May 26, 2013, Plaintiff's blood sugar levels were at 222 mg/dl in the morning, 450 mg/dl at lunch, and 279 mg/dl in the evening. Ex. 4-76. Defendant Ahmed testified that Plaintiff's insulin regimen was not the only factor affecting Plaintiff's blood sugar readings: "He took insulin. But he took the wrong food, high carbohydrate, it goes up because end result of any food you take, glucose, and that is the energy source." *Tr.* at 306:21-25. Accordingly, Defendant Ahmed asked Plaintiff to keep a diary of his meals, but Plaintiff refused: "That's why I asked him to keep a food diary. But he was not cooperating." *Id.* at 307:3-4. Defendant Ahmed testified that a food diary would provide Defendant Ahmed some visibility on Plaintiff's diet: "Maybe he's eating wrong

6

food or he's maybe eating sometimes too much. So I want the food diary. After that, I can discuss with him or I can send him to our diabetic educator to, to adjust it, what he should eat, what he should not." *Id.* at 363:17-24.

Defendant Ahmed also testified that although Plaintiff's blood sugar readings were sometimes high, an isolated reading of 400 mg/dl is not dangerous, unless persistent: "It is not dangerous. I can go 500, 600 it can go. . . . If it is a persistent – if it is a persistent, then yes." *Id.* at 282:10-12. As a result, Defendant Ahmed did not conduct a urine ketone test, which measures the ketones in the blood and can indicate whether a patent is suffering from ketoacidosis. *Id.* at 461:25-462:5. When asked whether he had testified at his deposition "that it was prison policy to do a urine test for ketoacidosis when the blood sugar reads over 400 mg/dl," Defendant Ahmed explained that he had misspoken at his deposition: "Oh yeah, I remember. I mean, it was – it is not needed. It is not medical necessity. But I misspoke. I was really nervous at that time in the deposition." *Id.* at 311:7-14.

On June 3, 2013, Defendant Ahmed had a follow-up appointment with Plaintiff. Ex. 3-4. Defendant Ahmed testified that he convened another physician, a registered nurse, and a licensed vocational nurse for the appointment to address the concerns Plaintiff was raising in the health care request forms: "This is here, I find it difficult, so I'm trying to find – come up with something because of my concern of his blood sugars and because I wanted to help him actually." Tr. at 384:19-385:11.

Defendant Ahmed testified that at the June 3, 2013 appointment, Plaintiff did not complain of any symptoms related to ketoacidosis, nor did Defendant Ahmed observe any such symptoms. *Id.* at 387:14-388:4 ("Q: Did he make any complaints to you of anything that was remotely akin to a ketoacidosis symptom? A: No."). Defendant Ahmed's notes from the June 3, 2013 appointment also indicate that Plaintiff's vital signs were normal. Ex. 3-4. Plaintiff testified that at the appointment, Defendant Ahmed's "demeanor was flat. There was no expression, no – no eye contact." Tr. at 195:18-19. After the June 3, 2013 appointment, Defendant Ahmed again adjusted

7

Plaintiff's insulin regimen. Specifically, Defendant Ahmed increased Plaintiff's evening base insulin from 25 units to 28 units. Ex. 323 at 4.

Defendant Ahmed scheduled another appointment with Plaintiff for three days later, June 6, 2013. Ex. 3-4. When asked whether there was "anything about your appointment with Mr. Peasley on June 6, 2013, that would lead you to believe that he was experiencing ketoacidosis?", Defendant Ahmed testified "No." Tr. at 395:8-11. After that appointment, Defendant Ahmed increased Plaintiff's evening dose of base insulin from 28 units to 30 units. Ex. 323 at 5. Defendant Ahmed also placed a referral request for Plaintiff to see an endocrinologist, a diabetes specialist. Ex. 321. Defendant Ahmed testified that he made the referral to help solve Plaintiff's issues with noncompliance: "By seeing him, maybe patient will become more convinced and then he will be – he will be more complaint with advices." Tr. at 396:12-14.

On June 12, 2013, Defendant Ahmed and Plaintiff had another appointment, after which Defendant Ahmed expedited Plaintiff's endocrinology consultation. Ex. 3-5. Defendant Ahmed also again adjusted Plaintiff's insulin regimen. Defendant Ahmed reduced Plaintiff's evening base insulin from 30 units to 25 units, and restored 5 units of breakfast regular insulin and 5 units of dinnertime regular insulin. Ex. 323-6.

On June 13, 2013, the next day, Defendant Ahmed and Plaintiff met again. Ex. 3-6. Defendant Ahmed testified that he scheduled the appointment after reviewing a request from Plaintiff for more insulin. Tr. at 402:10-19. Defendant Ahmed testified that Plaintiff had no musculoskeletal symptoms: "He came walking normally to my office and he has got no muscle pain, no joint pain, no abnormalities." *Id.* at 404:8-10.

On July 3, 2013, Defendant Ahmed again adjusted Plaintiff's insulin regimen. Defendant Ahmed reduced Plaintiff's morning base insulin from 30 units to 27 units and reduced Plaintiff's evening base insulin from 25 units to 22 units. Ex. 323 at 7. Defendant Ahmed also increased Plaintiff's breakfast regular insulin and dinnertime regular insulin from 5 units to 8 units each. *Id.*

On August 5, 2013, based on Defendant Ahmed's referral, Plaintiff met via teleconference

8

with Dr. Pawan Kumar, an endocrinologist and specialist in diabetes. Tr. at 202:10-17; Ex. 7-1. Dr. Kumar recommended decreasing Plaintiff's doses of base insulin and increasing Plaintiff's doses of regular insulin. Ex. 7-1. Defendant Ahmed implemented Dr. Kumar's recommendations, and reduced Plaintiff's doses of morning and evening base insulin to 22 units each. Ex. 323 at 8. Defendant Ahmed also increased Plaintiff's doses of breakfast regular insulin and dinnertime regular insulin from 8 units to 10 units each, and restored 6 units of lunchtime regular insulin. *Id.* Defendant Ahmed continued to provide Plaintiff sliding scale doses of regular insulin at mealtimes. *Id.*

At trial, Plaintiff testified that Defendant Ahmed's May 23, 2013 changes to Plaintiff's insulin regimen prevented Plaintiff from eating carbohydrates: "I could eat a salad, for instance. They give you half a cup of a salad. That has no carbohydrate value." Tr. at 187:20-22. "I went the first week with absolute minimal food. The second starting in June, I started trying to eat a small amount of morsels in the morning because I thought my body could get rid of it through the daytime." *Id.* at 197:16-19. Further, Plaintiff testified that the regimen change caused him fear. *Id.* at 188:9-10. Plaintiff also testified that once after the May 23, 2013 regimen change, Plaintiff lost consciousness while eating dinner: "A dinner tray had come and I remember putting it in front of me. I was – I think I was starting to eat it. My – I think I stuck a spoon in it or something, and the next thing I know is I woke up and it was almost three hours later." *Id.* at 198:17-21.

By contrast, Defendant Ahmed testified that Plaintiff's vital signs between May 23, 2013 and August 5, 2013 were "absolutely normal." Tr. at 360:7-22. At each appointment with Plaintiff, Defendant Ahmed or a nurse evaluated Plaintiff's vital signs. Ex. 407. Plaintiff's temperature, pulse, blood pressure, respiration rate, and weight all remained constant. *Id.* at 1–13. For example, Plaintiff's blood pressure was 155/81 on May 21, 2013, and was 124/74 on July 3, 2013. *Id.* at 1. Plaintiff weighed 197 pounds on May 21, 2013 and 198 pounds on July 3, 2013. *Id.*

When asked if Plaintiff was diagnosed with ketoacidosis in 2013, Plaintiff testified that

United States District Court
Northern District of California

Plaintiff diagnosed himself with ketoacidosis: "Q: Diagnosed by anyone? A: Myself, yes, absolutely, from training." Tr. at 255:2-11.

### 2. The Parties Presented Conflicting Expert Testimony on Defendant Ahmed's Adjustment to Plaintiff's Insulin Regimen

Two medical experts testified at trial, Dr. Suneil Koliwad for Plaintiff and Dr. Paul Fitzgerald for Defendants. Dr. Koliwad testified that Plaintiff's regimen prior to Defendant Ahmed's May 23, 2013 adjustment had "the essential elements that I think every patient with Type 1 diabetes must have. It has base insulin, mealtime insulin, and a safety net of sliding scale in case those two things aren't sufficient for whatever reason." Tr. at 449:2-6. Dr. Koliwad acknowledged that a doctor must adjust a Type 1 diabetic's insulin regimen: "Making changes to insulin regimens for individuals with diabetes, and in particular for people with Type 1 diabetes who know that their wellbeing moment to moment depends on the insulin that they take, is always necessary." *Id.* at 453:2-5.

However, Dr. Koliwad testified that the specific adjustments Defendant Ahmed implemented on May 23, 2013 were not appropriate: "All of the mealtime insulin has been withheld. The patient is no longer getting any insulin specifically because he's eating food, and that's intolerable for somebody with Type 1 diabetes, and it's completely inappropriate as far as standard medical care or somebody with Type 1 diabetes is concerned." *Id.* at 451:11-17. Further, Dr. Koliwad testified that a lack of mealtime insulin would cause hyperglycemia, and possibly ketoacidosis: "You know what is going to happen if you don't give somebody mealtime insulin who has Type 1 diabetes. Their sugars are going to go up really high and they're highly likely to go into diabetic ketoacidosis." *Id.* at 455:11-14.

Dr. Koliwad testified that at the least, Defendant Ahmed should have conducted a ketone test to determine whether Plaintiff was suffering from ketoacidosis: "[T]he very least you could do is follow the ketones routinely, you know, a couple of times a day to see whether any of that evidence is emerging, especially when you see the blood glucose going up like this." *Id.* at 462:20-25. Dr. Koliwad testified that Plaintiff's high blood sugar levels could have harmed

10

Plaintiff: "[H]igh blood sugars, in and of themselves, are an extreme stress on the system." *Id.* at 476:3-4. Dr. Koliwad also testified that Plaintiff might have had ketoacidosis:

> [B]ased on the fact that I know he was getting insufficient insulin for days and days and days, if not really weeks, my expectation would be that he would go into diabetic ketoacidosis. And so I think it's completely reasonable to conclude that that might have happened to him at any point during that period before the mealtime insulin was sufficiently added back.

*Id.* at 472:19-25.

Defendants' expert Dr. Fitzgerald disagreed. Dr. Fitzgerald opined that Plaintiff's diet may have affected Plaintiff's blood sugar readings: "Well, it's – diet is very important in, in both Type 1 and Type 2 diabetes, and we – don't let anyone tell you different. It's very important. If someone eats a good diabetes diet, which is fairly low in carbohydrates, it'll keep their blood sugar from going up excessively into the 3- and 400 milligrams per deciliter." *Id.* at 530:7-12.

Dr. Fitzgerald testified that Defendant Ahmed's insulin regimen change was designed to prevent episodes of low blood sugar:

> And I would say that during the first three weeks in May, before this regimen was instituted, Mr. Peasley had had five low blood sugars. And in the month before, in April, he's had nine hypoglycemic episodes. This is way too many, and that would be a rationale for going to a sliding scale insulin, at least for temporary reasons.

*Id.* at 536:4-9. Dr. Fitzgerald also testified that Plaintiff frequently received regular insulin at mealtimes due to the sliding scale prescription: "[S]liding scale was kicking in for those 22 days on 52 out of the – between – on 52 of the 66 meals, he got some insulin, regular insulin before those meals." *Id.* at 538:24-539:1. "[U]nder this regimen, he didn't get the insulin because his blood sugars looked so good because they were between – they were under 150." *Id.* at 539:4-6.

Dr. Fitzgerald testified that Plaintiff's high blood sugar levels and constant weight contradict Plaintiff's claims that he was unable to eat: "I don't think that there was any serious starvation going on. I – you know, judging from the weights that I reviewed and judging from these high blood sugars, I think he was eating." *Id.* at 542:22-25. Rather, Dr. Fitzgerald testified, it was possible that Plaintiff's displeasure with the insulin regimen affected his blood sugar levels:

Case No. 15-CV-01769-LHK
ORDER DENYING PLAINTIFF'S MOTION TO AMEND OR ALTER JUDGMENT; MOTION FOR
RECONSIDERATION; AND MOTION FOR A NEW TRIAL

"When someone gets very agitated, the emotion can raise blood sugars." *Id.* at 543:5-12.

Dr. Fitzgerald repeatedly testified that there was no evidence that Plaintiff suffered from ketoacidosis after Defendant Ahmed altered Plaintiff's insulin regimen:

- "There was absolutely no evidence of any sign or symptom of DK – of diabetic ketoacidosis, or DKA." *Id.* at 545:2-3.
- "I believe his vital signs were consistent with not having ketoacidosis." *Id.* at 559:21-22.
- "High blood sugars do not equal ketoacidosis. He had no signs or symptoms of diabetic ketoacidosis." *Id.* at 561:8-9.

When asked whether Defendant Ahmed should have given Plaintiff a urine ketone test at any point, Dr. Fitzgerald testified, "No, absolutely not." *Id.* at 560:2.

Dr. Fitzgerald testified that in sum, Plaintiff received excellent medical care from Defendant Ahmed: "I think Mr. Peasley was actually receiving excellent medical care. He was being seen by the doctor on multiple occasions; he was getting finger stick checks at least three times a day; he was getting insulin injections even during this period, ordinarily, five – at least four or five times a day." *Id.* at 561:13-17.

### 3. Evidence Related to Plaintiff's Claim Against Defendant Lopez

Plaintiff's deliberate indifference claim against Defendant Lopez arises from a November 4, 2013 incident. At trial, the parties presented the following evidence related to Plaintiff's claim.

Plaintiff resided in Lassen Hall at CTF. Tr. at 206:10-15; *see* Ex. 1-5 (image of Lassen Hall). Plaintiff testified that on November 4, 2013, Plaintiff received his pre-dinner insulin shot in Lassen Hall—rather than at the pill window—due to a security issue in the prison. Tr. at 207:15-24. According to Plaintiff, once a security issue cleared and inmates could go to dinner, the prison would typically first release inmates with diabetes for dinner. *Id.* at 207:25-208:6. Plaintiff testified that once the security issue cleared on November 4, 2013, Plaintiff asked Defendant Lopez to release Plaintiff to dinner with the other diabetic inmates, but Defendant Lopez told Plaintiff to go back to his cell and "eat crackers." *Id.* at 208:24-209:2. Inmates with diabetes received crackers as a daily snack in case of emergencies. *Id.* at 210:9-13.

United States District Court
Northern District of California

Accordingly, Plaintiff testified that he remained in his cell that evening and ate crackers. *Id.* at 211:1-15. When asked "Physically did you notice anything that night?" after missing dinner, Plaintiff testified that he was hungry and irritated: "There was a – hungry for a real meal. I wasn't real happy everybody in the whole building got to eat." *Id.* at 211:15-17. Further, when asked whether he requested medical care on November 4, 2013, Plaintiff testified that he did not: "I requested food. No." *Id.* at 256:9-11. At trial, Defendant Lopez testified that she could not recall any events from November 4, 2013, including whether Plaintiff asked Defendant Lopez to release Plaintiff to the dining hall. *Id.* at 265:2-6.

On the evening of November 4, 2013, Plaintiff's blood sugar was measured at 258 mg/dl. Ex. 408. Defendants' expert Dr. Fitzgerald testified that if Plaintiff had in fact missed a meal, Plaintiff's blood sugar should have been much lower: "And, you know, if Mr. Peasley had received his usual insulin there on November 4 at dinner and then not eaten at all, his blood sugar would have been lower. So he – he obviously ate." Tr. at 563:15-18. By contrast, Plaintiff's expert Dr. Koliwad testified that he guessed that Plaintiff's body may have naturally increased Plaintiff's blood sugar: "[H]e might have a very robust counter-regulatory system that would bring the sugars back up after several hours." *Id.* at 504:20-22. However, Dr. Koliwad testified that he could not be sure how Plaintiff's blood sugar reached 258 mg/dl absent food: "But to know for sure, you would have had to have measured the blood sugar at least every half hour or hourly to document the trajectory of what it actually did." *Id.* at 505:1-3.

### B. Procedural History

Plaintiff, proceeding *pro se*, filed his original complaint on May 22, 2015. ECF No. 13. Plaintiff's original complaint raised 15 counts. *See id.* Plaintiff's original complaint brought claims against Defendants Ahmed and Lopez, as well as Defendants Warden Spearman, CMO Bright, and Officers Mullen, Orozco, and Gibson. *Id.*

After screening the original complaint, the Court dismissed Counts 6-11 of the original complaint with leave to amend and Count 15 of the original complaint without leave to amend on

13

September 18, 2015.  ECF No. 28.

Then, on October 19, 2015, Plaintiff filed his amended complaint.  *See* ECF No. 31.
Plaintiff's amended complaint also raised 15 counts.  *See id.*; ECF Nos. 31-1 & 31-2.  Plaintiff
added claims against Defendant Ellis.  ECF No. 31.

On March 15, 2016, after screening the amended complaint, the Court dismissed Counts
10 and 15.  ECF No. 53 at 4.  On July 18, 2016, Defendants moved to dismiss Counts 1-9 and 11-
13 based on res judicata, and Defendant Ahmed moved for summary judgment on Counts 2 and
14.  ECF No. 90.  Plaintiff filed an opposition on September 6, 2016, ECF No. 111, and
Defendants filed a reply on September 20, 2016.  ECF No. 114.

On May 23, 2016, Plaintiff filed a motion for summary judgment on Counts 6-9.  ECF No.
76.  On July 19, 2016, Defendants filed an opposition that essentially parroted their res judicata
argument on Counts 1–9 and 11–13, and Defendant Ahmed's summary judgment argument on
Counts 2 and 14.  ECF No. 95.

On July 29, 2016, Plaintiff filed a second motion for summary judgment, this time on
Counts 1–5 and 11– 14.  ECF No. 97.  On August 12, 2016, Defendants filed a statement that their
previously filed July 19, 2016 opposition should serve as an opposition to Plaintiff's second
motion for summary judgment as well.  ECF No. 103.  On August 29, 2016, Plaintiff filed replies
to Defendants' opposition.  ECF Nos. 108 & 109.

On March 6, 2017, the Court denied Defendants' motion to dismiss Counts 1–9 and 11–13
based on res judicata, granted Defendant Ahmed's motion for summary judgment on Counts 2 and
14, and referred the matter to settlement proceedings.  ECF No. 151.  The Court informed the
parties that if settlement proceedings were unsuccessful, the Court would then resolve Plaintiff's
motions for summary judgment.  *Id.* at 19.  On May 11, 2017, the Court was informed that the
parties were unable to settle.  *See* ECF No. 165.

On September 26, 2017, the Court denied Plaintiff's motions for summary judgment on
Counts 1, 3–7, and 11–13.  ECF No. 193.  The Court declined to address Counts 8 or 9 because

Case No. 15-CV-01769-LHK
ORDER DENYING PLAINTIFF'S MOTION TO AMEND OR ALTER JUDGMENT; MOTION FOR
RECONSIDERATION; AND MOTION FOR A NEW TRIAL

those Counts "name [Officer] Lopez as the sole defendant," and at that time, Officer Lopez had not entered an appearance in the case. *Id*. at 3. The Court ordered the Federal Pro Se Program to locate counsel for plaintiff. *Id.* at 14.

On October 4, 2017, the Court appointed Joseph Farris and Michael Malecek of Arnold & Porter Kaye Scholer, LLP as counsel for Plaintiff pursuant to 28 U.S.C. § 1915(e)(1) and the Court's Federal Pro Bono Project guidelines. ECF No. 195. Jeffrey Miller and Carson Anderson—also from Arnold & Porter—later appeared on behalf of Plaintiff, and Malecek withdrew. ECF Nos. 202, 210, 214.

On October 9, 2017, Defendants filed a motion to dismiss and for summary judgment. ECF No. 197. Defendants moved to dismiss some of Plaintiff's claims on Eleventh Amendment immunity grounds, moved to dismiss Plaintiff's request for injunctive relief on mootness grounds, and moved for summary judgment on all Counts. *See id.* On November 14, 2017, the Court denied Defendants' motion to dismiss on Eleventh Amendment immunity grounds and denied Defendants' motion for summary judgment on the basis that it was a successive motion for summary judgment. ECF No. 204. On January 19, 2018, the Court granted Defendants' motion to dismiss Plaintiff's request for injunctive relief on mootness grounds. ECF No. 218.

On November 21, 2017, Defendants Bright, Ellis, Gibson, Orozco, and Spearman moved for leave to file a motion for reconsideration of the Court's denial of Defendants' motion for summary judgment. ECF No. 206. Those Defendants stated that they had only filed a single motion for summary judgment, and had not joined Defendant Ahmed's July 18, 2016 motion for summary judgment. *See* ECF No. 90.

On December 22, 2017, Defendant Lopez entered an appearance in the case. ECF No. 212. On December 22, 2017, the Court issued a case management order, and ordered that Defendants Bright, Ellis, Gibson, Orozco, Lopez, and Spearman could collectively file one motion for summary judgment by August 3, 2018. ECF No. 213. The Court therefore denied as moot Defendants' motion for leave to file a motion for reconsideration. *Id.*

United States District Court
Northern District of California

1    On August 3, 2018, Defendants Bright, Ellis, Gibson, Orozco, Lopez, and Spearman filed

2  a motion for judgment on the pleadings and for summary judgment.  ECF No. 238.  Plaintiff filed

3  an opposition on August 17, 2018, ECF No. 241, and Defendants filed a reply on August 24, 2018.

4  ECF No. 243.

5    On August 3, 2018, Defendant Ahmed moved for leave to file a successive motion for

6  summary judgment.  ECF No. 239.  On August 17, 2018, Plaintiff filed a motion for leave to file a

7  late opposition to Defendant Ahmed's motion for leave to file a successive summary judgment

8  motion.  ECF No. 242.

9    On September 18, 2018, the Court granted Defendant Ahmed's motion for leave to file a

10  successive motion for summary judgment, granted Plaintiff's motion for leave to file a late

11  opposition to Defendant Ahmed's motion for leave to file a successive motion for summary

12  judgment, and denied Defendants' motion for judgment on the pleadings.  ECF No. 248.

13    On September 18, 2018, the Court granted in part and denied in part Defendants' motion

14  for summary judgment.  *Id.*  The Court granted Defendants' motion for summary judgment on

15  Counts 1 and 6 for failure to exhaust administrative remedies.  *Id.* at 21, 25.  The Court granted

16  Defendants' motion for summary judgment on Counts 3, 5, 7, 9, 11, 12, and 13 for failure to raise

17  a genuine dispute of material fact as to whether any Defendants were deliberately indifferent.  *Id.*

18  at 30–39.  The Court also granted Defendants Spearman and Ellis's motion for summary judgment

19  on Count 4.  *Id.* at 33.  However, the Court denied Defendant Ahmed's motion for summary

20  judgment on Count 4 and denied Defendant Lopez's motion for summary judgment on Count 8.

21  *Id.* at 33, 37.

22    The case then proceeded to trial on Plaintiff's claims in Count 4 against Defendant Ahmed

23  and Count 8 against Defendant Lopez.  On November 16, 19, and 20, 2018, the Court held a three-

24  day jury trial.  ECF Nos. 316, 317, 322.  On November 20, 2018, the jury returned a verdict.  ECF

25  No. 321.  The jury found in favor of Defendant Ahmed on Plaintiff's Eighth Amendment claim

26  against Defendant Ahmed and found in favor of Defendant Lopez on Plaintiff's Eighth

27

28

Amendment claim against Defendant Lopez. *Id.* On November 20, 2018, the Court entered judgment in favor of Defendants Ahmed and Lopez and against Plaintiff. ECF No. 320.

On December 17, 2018, Plaintiff filed the three post-trial motions at issue. Plaintiff filed (1) a motion to amend or alter judgment, ECF No. 330 ("Mot. to Amend"); (2) a motion for reconsideration, ECF No. 331 ("Reconsideration Mot."); and (3) a motion for a new trial, ECF No. 332 ("New Trial Mot.").

On December 18, 2018, Plaintiff's pro bono counsel appointed for trial filed a motion to withdraw as counsel. ECF No. 336. On December 21, 2018, the Court granted Plaintiff's pro bono counsel's motion to withdraw. ECF No. 339.

On December 18, 2018, Plaintiff filed a notice of appeal to the Ninth Circuit Court of Appeals. ECF No. 335. On December 18, 2018, in a letter to the Court, Plaintiff explained that Plaintiff had filed a notice of appeal in case this Court deemed Plaintiff's post-trial motions untimely: "I have filed multiple motions and due to the prison restrictions and loss of legal material, this Court may still deny all motions as late. For this reason and to be timely, I have now also sent a 'notice of appeal.'" ECF No. 334.

On December 31, 2018, Plaintiff filed an "Addendum" to his post-trial motions. ECF No. 342.

On January 2, 2019, the Court filed an order stating that Plaintiff could either pursue his appeal to the Ninth Circuit or his post-trial motions, but could not simultaneously pursue both because the Court lacked jurisdiction over Plaintiff's post-trial motions with Plaintiff's appeal pending. ECF No. 341. The Court ordered Plaintiff to elect by January 23, 2019 whether to pursue an appeal or his post-trial motions. *Id.* at 2. The Court also extended Defendants' deadline to reply to Plaintiff's post-trial motions to February 6, 2019. *Id.*

On January 7, 2019, the Ninth Circuit filed an order stating that because Plaintiff's post-trial motions remained pending in this Court and Plaintiff's notice of appeal was thus ineffective, the Ninth Circuit would hold Plaintiff's appeal in abeyance until this Court resolves Plaintiff's

United States District Court
Northern District of California

post-trial motions. ECF No. 344.

On January 18, 2019, Plaintiff elected to pursue his post-trial motions rather than an appeal. ECF No. 346.

On February 6, 2019, Defendants filed their opposition to Plaintiff's motion to amend or alter judgment, ECF No. 347 ("Amend Opp."), opposition to Plaintiff's motion for reconsideration, ECF No. 348 ("Reconsideration Opp."), and opposition to Plaintiff's motion for new trial. ECF No. 349 ("New Trial Opp."). Defendants' oppositions to Plaintiff's three motions total about three pages and were not helpful to the Court in resolving these motions. Defendants served the oppositions electronically, although Plaintiff is now proceeding pro se and does not have electronic filing privileges. ECF No. 350. Defendants' electronic service appears to have been in good faith, as after Plaintiffs' pro bono counsel withdrew, the Court's docket was not updated to reflect that Plaintiff does have not have electronic filing privileges. *See* ECF No. 339.

On February 25, 2019, Plaintiff filed a statement on the docket that Plaintiff had not received Defendants' three oppositions to Plaintiff's post-trial motions. ECF No. 351.

On February 27, 2019, the Court ordered Defendants to serve Defendants' three oppositions on Plaintiff by mail and to file a proof of service on the docket by February 28, 2019. ECF No. 352. The Court also extended the deadline for Plaintiff to reply to Defendants' oppositions to March 22, 2019. *Id.* On February 27, 2019, Defendants filed proof of service of Defendants' oppositions. ECF No. 353.

On March 11, 2019, Plaintiff filed a "notice of Defendants' default and motion to deny late action after default," which Plaintiff had dated on February 26, 2019, before Defendants served their three oppositions on Plaintiff. ECF No. 354. Plaintiff stated that all his "legal notes of research, trial, and post trial, have been 'lost' by the prison. This is serious and has greatly caused harm." *Id.* at 2. On that basis, Plaintiff requested that the Court "deny any late remedy for the motions." *Id.* However, as explained, Defendants timely filed their oppositions, but in good faith failed to mail the oppositions to Plaintiff. On February 27, 2019, to avoid any potential prejudice

18

to Plaintiff, the Court extended the deadline for Plaintiff to file his post-trial motion reply briefs from February 20, 2019 to March 22, 2019. Accordingly, the Court DENIES Plaintiff's "motion to deny late action after default."

On March 22, 2019, Plaintiff filed a letter, dated March 17, 2019, that stated Plaintiff would mail his reply briefs due March 22, 2019 "as soon as able." ECF No. 355.

On March 25, 2019, Plaintiff filed a motion for extension of time to file his reply briefs, ECF No. 356, and a motion for leave to file amended post-trial motions. ECF No. 357. Plaintiff stated in his motion for leave that his post-trial motions are "too broad and specific. People and their words can show lies, perjury, and fraud. These details were not available due to the prison." ECF No. 357 at 2. Thus, Plaintiff requested leave to amend his post-trial motions. *Id.*

On March 26, 2019, the Court denied Plaintiff's motions for an extension to file his reply briefs in support of his post-trial motions and for leave to amend his post-trial motions. ECF No. 358. The Court explained that although Plaintiff requested leave to amend to add new information from the trial record that Plaintiff claimed was unavailable, Plaintiff had not stated in any of his post-trial motions filed three months earlier that he lacked access to information necessary for his post-trial motions. *Id.* at 2. Only on the eve of Plaintiff's reply deadline had Plaintiff moved to amend his post-trial motions. *Id.* The Court also noted that because Plaintiff had not yet filed his reply briefs in support of his post-trial motions, Plaintiff could cite the purportedly unavailable information from the trial record in his reply briefs, if Plaintiff so chose. *Id.*

On April 8, 2019, Plaintiff filed a document titled "informal notice" in response to the Court's March 26, 2019 order. ECF No. 361. Plaintiff stated, "As I promised the 3-22-19 reply date, my intent for a 'reply,' was to amend. The late opposition was in need of data that makes me fear the introduction of new facts." *Id.* (emphasis in original). Plaintiff stated that Plaintiff would shortly mail his reply in support of his post-trial motions. *Id.*

On April 8, 2019, Plaintiff filed another motion for an extension of time to file his reply briefs in support of his post-trial motions, based on "newly available information." ECF No. 362.

United States District Court
Northern District of California

In a declaration, Plaintiff stated that Plaintiff had identified "extensive matters of fraud and or perjury" in Defendants' oppositions to Plaintiff's post-trial motions. *Id.* at 2. Thus, Plaintiff stated that he "found new specific details were needed, thus the leave for an amended motion." *Id.*

Then, on April 11, 2019, Plaintiff filed one reply brief in support of his three post-trial motions. ECF No. 362 ("Reply"). The Court hereby GRANTS Plaintiff's motion for an extension of time for to file his reply brief, ECF No. 362, such that Plaintiff's April 11, 2019 reply brief is deemed timely.

Plaintiff has also filed three pending motions requesting the trial transcript: a motion for copy of trial transcript, ECF No. 343; a first motion for transcript designation for appeal, ECF No. 345; and a second motion for transcript designation for appeal. ECF No. 362. However, the Court DENIES as moot Plaintiff's motions because Plaintiff appears to already have a copy of the trial transcript, as Plaintiff's Reply in support of his post-trial motions cites specific pages and lines of the trial transcript. *See* Reply at 6. To the extent Plaintiff wishes to ensure that the Ninth Circuit receives a copy of the trial transcript for appeal, Plaintiff should pose that request to the Ninth Circuit, not this Court. Moreover, the trial transcript is available electronically on the case docket.

## II.     LEGAL STANDARD

### A.   Federal Rule of Civil Procedure 59(a)

Federal Rule of Civil Procedure 59(a) provides that following a jury trial, a court "may, on motion, grant a new trial." Fed. R. Civ. P. 59(a)(1). A new trial is appropriate under Federal Rule of Civil Procedure 59 "only if the jury verdict is contrary to the clear weight of the evidence." *DSPT Int'l, Inc.*, 624 F.3d 1213, 1218 (9th Cir. 2010). "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). In sum, a court should grant a new trial only where necessary "to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007).

### B.   Federal Rule of Civil Procedure 60

Case No. 15-CV-01769-LHK
ORDER DENYING PLAINTIFF'S MOTION TO AMEND OR ALTER JUDGMENT; MOTION FOR
RECONSIDERATION; AND MOTION FOR A NEW TRIAL

United States District Court
Northern District of California

By contrast, Rule 59(e) concerns motions to alter or amend a judgment. Fed. R. Civ. P. 59(e). A court may grant a Rule 59(e) motion "if it is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *Wood v. Ryan*, 759 F.3d 1117, 1121 (9th Cir. 2014) (internal quotation marks and citation omitted). A district court has "considerable discretion" in considering a Rule 59(e) motion, *Turner v. Burlington N. Santa Fe R.R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003), and amending a judgment after its entry is "an extraordinary remedy which should be used sparingly." *McDowell v. Calderon*, 197 F.3d 1253, 1255 n.1 (9th Cir. 1999) (en banc) (per curiam). A Rule 59(e) motion may not "raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000).

## III.  DISCUSSION

Before the Court are Plaintiff's three separate post-trial motions for relief. Plaintiff has filed a motion to amend or alter the judgment, a motion for reconsideration, and a motion for a new trial. Plaintiff, who is proceeding pro se post-trial, states that he filed three motions in an abundance of caution: "The Court may prefer one method of a 'motion' over another. The motion or motions used or denied will be up to the judges [sic] discretion." Mot. to Amend at 2. Plaintiff also states "one main supporting exhibit will apply to each of these three motions." *Id.* Before turning to the substance of Plaintiff's arguments, the Court discusses the overlap between Plaintiff's three post-trial motions, and identifies the arguments that are properly before the Court.

### A.  What Arguments in Plaintiff's Post-Trial Motions are Properly Before the Court

First, Plaintiff's motion to amend or alter the judgment appears to ask the Court to enter judgment for Plaintiff as a matter of law: "The Plaintiff prays this Court to simply amend or alter the judgment to reflect favor upon the Plaintiff. To hold a second trial would be expensive to only answer the deliberate indifference question." *Id.* at 8. Plaintiff requests $200,000 in damages. *Id.* However, the Court cannot enter judgment as a matter of law for Plaintiff under Federal Rule of Civil Procedure 50 because Plaintiff failed to move for judgment as a matter of law during trial.

21

*See Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 183 n.9 (9th Cir. 1989) (noting that a party must file a motion for judgment as a matter of law during trial as a prerequisite to filing a motion for judgment as a matter of law after the jury's verdict).

To the extent that Plaintiff requests to amend or alter the judgment under Rule 59(e), Plaintiff's motion does not identify any newly discovered evidence or an intervening change in the controlling law. *See Wood*, 759 F.3d at 1121 (holding that a court may grant Rule 59(e) relief only if the court "is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law"). Plaintiff conclusorily states the grounds for Rule 59(e) relief and then articulates purported errors in the jury's verdict. Mot. to Amend at 3. The only purported error Plaintiff identifies that could qualify as "clear error" by the Court under Rule 59(e) is the Court's decision to permit Defendants' expert, Dr. Paul Fitzgerald, to testify. *See id.* at 3–4. The Court discusses this argument in more detail below.

Second, Plaintiff states that his motion for reconsideration applies only if the Court denies Plaintiff's motion to amend or alter the judgment, and includes no substantive argument: "Though new facts are present, motion #1 should be denied <u>prior</u> to hearing this motion #2." Reconsideration Mot. at 1 (emphasis in original). If the Court denies Plaintiff's motion to amend or alter the judgment, Plaintiff requests a "short stay to then supply a proper and complete addendum to this motion for reconsideration." *Id.* at 2. However, Plaintiff may not preemptively file a motion for reconsideration, nor is such a motion appropriate post-judgment. Under the Civil Local Rules, "[b]efore the entry of a judgment adjudicating all of the claims and the rights and liabilities of all the parties in a case, any party may make a motion before a Judge requesting that the Judge grant the party leave to file a motion for reconsideration." Civ. L.R. 7-9(a). Plaintiff filed his reconsideration motion *after* the Court entered judgment "adjudicating all of the claims and the rights and liabilities of all the parties in a case." *See* ECF No. 320. Regardless, Plaintiff's motion for reconsideration offers no substantive argument. Therefore, the Court DENIES Plaintiff's motion for reconsideration.

Case No. 15-CV-01769-LHK
ORDER DENYING PLAINTIFF'S MOTION TO AMEND OR ALTER JUDGMENT; MOTION FOR
RECONSIDERATION; AND MOTION FOR A NEW TRIAL

1   Third, Plaintiff's new trial motion explicitly relies on the same grounds as Plaintiff's

2   motion to amend or alter the judgment, as Plaintiff opens his new trial motion with the following

3   statement: "The Plaintiff asks this Court to reflect on Motion #1 [the motion to amend or alter the

4   judgment]." New Trial Mot. at 2. Plaintiff also asks the Court to partially reverse its September

5   18, 2018 summary judgment order, and to reinstate Counts 5, 6, and 9 if the Court orders a new

6   trial. *Id.* at 4. However, a motion for a new trial is not the proper vehicle to ask for

7   reconsideration of the Court's summary judgment order. Moreover, as explained above, Plaintiff

8   has long missed the deadline to request reconsideration of the Court's September 18, 2018

9   summary judgment order, as a motion for leave to file a motion for reconsideration must be made

10  "[b]efore the entry of a judgment adjudicating all of the claims and the rights and liabilities of all

11  the parties in a case." Civ. L.R. 7-9(a). The Court therefore DENIES Plaintiff's request to

12  reinstate Counts 5, 6, and 9.

13      Outside of that reinstatement request, Plaintiff's motion for a new trial raises similar

14  grounds for relief as Plaintiff's motion for a new trial. In the two motions, Plaintiff raises the

15  following three arguments for relief: (1) the jury wrongly found that Defendant Ahmed was not

16  deliberately indifferent because Defendant Ahmed "perjured himself"; (2) the Court should have

17  excluded the testimony of Defendant's expert Dr. Fitzgerald because Dr. Fitzgerald commingled

18  discussions of Type 1 and Type 2 diabetes; and (3) the jury's verdict for Defendant Lopez is

19  contrary to the evidence. New Trial Mot. at 2–3, Mot. to Amend at 3–4. The Court addresses

20  each of Plaintiff's arguments in turn.

21  **B. The Jury's Finding that Defendant Ahmed was not Deliberately Indifferent is Not
    Contrary to the Clear Weight of the Evidence**

22  
23      Plaintiff argues that the jury's verdict for Defendant Ahmed on Count 8 is contrary to the

    evidence because Defendant Ahmed "perjured himself to hide his guilt." Mot. to Amend at 3.
24  
    Plaintiff also argues that the trial evidence shows that Defendant Ahmed "was frustrated and with
25  
    intent caused harm then failed to correct or treat." *Id.* However, Plaintiff has not shown that
26  
27  Defendant Ahmed perjured himself, or that the jury's verdict is unsupported by the evidence. The

                                                23

28  Case No. 15-CV-01769-LHK
    ORDER DENYING PLAINTIFF'S MOTION TO AMEND OR ALTER JUDGMENT; MOTION FOR
    RECONSIDERATION; AND MOTION FOR A NEW TRIAL

Court first discusses the showing required to prove deliberate indifference and then addresses Plaintiff's arguments.

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds, WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.* (citing *Estelle*, 429 U.S. at 104). A prison official is deliberately indifferent if he knows a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Type 1 diabetes is a serious medical condition for purposes of Eighth Amendment analysis. *Lolli v. Cty. of Orange*, 351 F.3d 410, 419 (9th Cir. 2003).

To satisfy the second element of deliberate indifference, a prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must also draw the inference." *Farmer*, 511 U.S. at 837. Consequently, in order for deliberate indifference to be established, a plaintiff must show that the defendant purposefully acted or failed to act, and that harm resulted. *See McGuckin*, 974 F.2d at 1060. A claim of medical malpractice or negligence is insufficient to establish a violation of the Eighth Amendment. *Id.* at 1059. Nor do disagreements in medical opinion suffice to show deliberate indifference. *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004). "Rather, to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment was 'medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's] health." *Id.* (citing *Jackson v. McIntos*h, 90 F.3d 330, 332 (9th Cir. 1996) (alteration in original)).

United States District Court
Northern District of California

At trial, the jury found that Defendant Ahmed was not liable for deliberate indifference based on Defendant Ahmed's May 23, 2013 alteration of Plaintiff's insulin regimen. The evidence at trial showed that on May 23, 2013, Defendant Ahmed increased Plaintiff's dose of morning base insulin from 23 units to 30 units, and his evening base insulin from 18 units to 25 units. ECF No. 323 at 3. Defendant Ahmed also removed standing doses of regular insulin from mealtimes. *Id.* However, Defendant Ahmed continued to provide Plaintiff regular insulin on a sliding scale at mealtimes. *Id.* Thus, as Defendant Ahmed explained, Plaintiff continued to receive regular insulin, although the doses depended on Plaintiff's blood sugar levels: "Sliding scale means giving insulin if blood sugar is high, to give higher dose. If it's low, to give lower dose." Tr. at 418:9-10. Defendant Ahmed testified that he adjusted Plaintiff's insulin regimen because he thought that given Plaintiff's low blood sugar readings, "possibly [Plaintiff] was receiving excess of insulin." *Id.* at 292:23-24.

In his post-trial motions, Plaintiff's chief argument is that Defendant Ahmed lied at trial about whether Defendant Ahmed should have conducted a urine ketone test on Plaintiff after Defendant Ahmed changed Plaintiff's insulin regimen. After the change, Plaintiff's blood sugar levels occasionally rose about 400 mg/dl. *See* Ex. 322 (showing 5 readings of 400 mg/dl or above between May 23, 2013 and June 5, 2013). Defendant Ahmed testified that he did not conduct a urine ketone test. Tr. at 311:22-25 ("I don't need to do this one. This is not medically indicated.").

In his deposition, Defendant Ahmed testified that when a patient's blood sugar exceeds 400 mg/dl, the protocol was to conduct a urine ketone test:

> **Q**: Would the patient also receive a urine test ever because of a high blood test?
> **A**: Okay. Yes. More than 400. That is the protocol. Protocol is there, do the urine test.
> **Q**: Do you what the number is? Is it 400?
> **A**: Above 400.

ECF No. 241-21, at 20:25-21:5. At trial, Defendant Ahmed acknowledged his deposition testimony, but testified that he had misspoken out of nervousness: "I mean, it was – it is not

United States District Court
Northern District of California

needed. It is not medical necessity. But I misspoke. I was really nervous at that time in the deposition." Tr. at 311:11-14. Plaintiff argues that Defendant Ahmed thus "perjured himself to hide his guilt." Mot. to Amend at 3.

However, Defendant Ahmed acknowledged the inconsistency between his deposition testimony and his actions, and explained that he had misspoken. The jury was entitled to believe or disbelieve Defendant Ahmed's explanation for his prior deposition testimony. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (internal quotation marks and citation omitted). Moreover, Defendants' expert Dr. Fitzgerald testified consistently with Defendant Ahmed that a urine ketone test was unnecessary: "Q: And was there ever any need, based on the review of the record in this case, to take a urine test of Mr. Peasley? A: No, absolutely not." Tr. at 560:25-561:2.

In support of his argument, Plaintiff attempts to rely on evidence that after the trial in this case, a nurse at San Quentin State Prison told Plaintiff that she would conduct a ketone test if a diabetic's blood sugar was over 400 mg/dl. *See* Mot. to Amend at 9. Plaintiff concedes that this statement is inadmissible hearsay. Reply at 5.

Otherwise, Plaintiff's argument for a new trial starts from the mistaken premise that Defendant Ahmed's May 23, 2013 alteration of Plaintiff's insulin regimen meant that Plaintiff received no insulin at all. *See* New Trial Mot. at 2 (arguing that Defendant Ahmed's reasons do not justify "withholding all meal insulin"); *see also* Reply at 5 ("Any 'plan' is legal, but no care was given. There was no treatment as Dr. Ahmed fails to react – this is deliberate indifference.").

However, the May 23, 2013 insulin regimen change provided Plaintiff 30 units of base insulin in the morning and 25 units of base insulin in the evening. Ex. 323 at 3. In addition, Plaintiff received mealtime regular insulin on a sliding scale. *Id.* Defendants' expert Dr. Fitzgerald testified that under the sliding scale regimen, Plaintiff received doses of mealtime regular insulin on 52 out of 66 occasions: "[S]liding scale was kicking in for those 22 days on 52

Case No. 15-CV-01769-LHK
ORDER DENYING PLAINTIFF'S MOTION TO AMEND OR ALTER JUDGMENT; MOTION FOR
RECONSIDERATION; AND MOTION FOR A NEW TRIAL

United States District Court
Northern District of California

out of the – between – on 52 of the 66 meals, he got some insulin, regular insulin before those meals." *Id.* at 538:24-539:1. When Plaintiff's blood sugar levels were already regulated, Plaintiff did not receive mealtime regular insulin, as Dr. Fitzgerald testified: "[U]nder this regimen, he didn't get the insulin because his blood sugars looked so good because they were between – they were under 150." *Id.* at 539:4-6.

By contrast, the cases Plaintiff cites all involve circumstances where the prison categorically withheld insulin or other treatment from a patient in dire medical need. For example, in *Lolli*, 351 F.3d 410, the Ninth Circuit held that "[l]eaving a diabetic such as Lolli without proper food or insulin when it is needed creates an 'objectively, sufficiently serious' risk of harm." *Id.* at 420. In *Lolli*, the defendants were not doctors pursuing a new course of treatment, but corrections officers who refused to provide the plaintiff any insulin or food at all—and who beat the plaintiff when he protested. *Id.* at 420–21; *see also Hunt v. Uphoff*, 199 F.3d 1220, 1223 (10th Cir. 1999) (holding that the plaintiff's allegations that a doctor denied the diabetic plaintiff insulin entirely, and that plaintiff later suffered a heart attack, sufficed to state a claim for deliberate indifference); *Egebergh v. Nicholson*, 272 F.3d 925, 928 (7th Cir. 2001) (denying a motion for summary judgment where guards deprived diabetic inmate of a scheduled insulin shot, and inmate subsequently died).

Plaintiff attempts to analogize his case to *Lolli*, *Hunt*, and *Egebergh* by arguing that Defendant Ahmed failed to address Plaintiff's complaints, and thereby denied treatment, like the defendants in those cases: "He also proves a constant contact with nurses who all knew of my diet to not eat and pain. So again, to not act is deliberate indifference." Mot. to Amend at 5. However, no nurse testified at trial that Plaintiff could not eat or was in pain, nor did any other witness other than Plaintiff. Plaintiff's weight remained nearly constant before and after the insulin regimen change, which Dr. Fitzgerald testified contradicts Plaintiff's claims that Plaintiff could not eat: "I don't think that there was any serious starvation going on. I – you know, judging from the weights that I reviewed and judging from these high blood sugars, I think he was eating."

27

*Id.* at 542:22-25.

Moreover, the evidence is sufficient to support a finding that Defendant Ahmed responded to Plaintiff's concerns, and did not deny Plaintiff treatment as in *Lolli*, *Hunt*, or *Egebergh*. For one, Defendant Ahmed testified that he adjusted Plaintiff's insulin regimen on May 23, 2013 because given Plaintiff's low blood sugar readings, Defendant Ahmed thought that "possibly [Plaintiff] was receiving excess of insulin." *Id.* at 292:23-24. Defendant Ahmed wished to provide regular insulin on a sliding scale rather than as standing mealtime doses to determine the optimal amount of insulin for Plaintiff: "Sliding scale usually will do to find out what is the amount he need." *Id.* at 422:13-14.

Then, after Plaintiff complained about the regimen change and Plaintiff's blood sugar levels continued to fluctuate, Defendant Ahmed testified that he gathered another physician, a registered nurse, and a licensed vocational nurse to address Plaintiff's concerns: "I find it difficult, so I'm trying to find – come up with something because of my concern of his blood sugars and because I wanted to help him actually." *Id.* at 384:19-385:11. In total, Defendant Ahmed made four additional adjustments to Plaintiff's insulin regimen, on June 3, June 6, June 12, and July 3, *before* Dr. Kumar recommended other adjustments. *See* Ex. 323 at 4–7. Defendant Ahmed also had several follow-up appointments with Plaintiff shortly after the May 23, 2013 change, including on June 3, June 12, and June 13. Exs. 3-4, 3-5, 3-6. Accordingly, the trial evidence supports a jury finding that Defendant Ahmed did not "deny, delay, or intentionally interfere" with Plaintiff's treatment. *See Hunt v. Dental Dep't*, 865 F.2d 198, 201 (9th Cir. 1989) ("Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment.").

There was also conflicting expert testimony on the appropriateness of Defendant Ahmed's insulin regimen change. Dr. Fitzgerald testified that Defendant Ahmed's insulin regimen change was designed to prevent episodes of low blood sugar:

And I would say that during the first three weeks in May, before this regimen was instituted, Mr. Peasley had had five low blood sugars. And in the month before, in

28

April, he's had nine hypoglycemic episodes. This is way too many, and that would be a rationale for going to a sliding scale insulin, at least for temporary reasons.

*Id.* at 536:4-9. On the other hand, Dr. Koliwad testified that Defendant Ahmed's change was "completely inappropriate as far as standard medical care or somebody with Type 1 diabetes is concerned." *Id.* at 451:11-17. As explained above, "the weighing of the evidence" is a quintessential jury function. *Reeves*, 530 U.S. at 150. The jury could have concluded based on Dr. Fitzgerald's testimony that Defendant Ahmed's decision was not "medically unacceptable under the circumstances," and that he was thus not liable for deliberate indifference. *Toguchi*, 391 F.3d at 1058 (holding that "a mere difference of medical opinion" is insufficient to establish deliberate indifference).

Finally, the evidence also supports the jury's finding of no deliberate indifference because the jury could have found that Defendant Ahmed's insulin regimen change did not harm Plaintiff. *See McGuckin*, 974 F.2d at 1060 (holding that a plaintiff must show harm to prevail on a deliberate indifference claim). Plaintiff testified that he diagnosed himself with ketoacidosis: "Q: Diagnosed by anyone? A: Myself, yes, absolutely, from training." Tr. at 255:2-11. However, Plaintiff's vital signs were normal throughout the period in question, *see* Ex. 407, Defendant Ahmed testified that Plaintiff never manifested any symptoms of ketoacidosis, *see, e.g.*, Tr. at 387:14-388:4, and Dr. Fitzgerald testified unequivocally that Plaintiff's medical records do not reveal any evidence of ketoacidosis:

- "There was absolutely no evidence of any sign or symptom of DK – of diabetic ketoacidosis, or DKA." *Id.* at 545:2-3.
- "I believe his vital signs were consistent with not having ketoacidosis." *Id.* at 559:21-22.
- "High blood sugars do not equal ketoacidosis. He had no signs or symptoms of diabetic ketoacidosis." *Id.* at 561:8-9.

Even Plaintiff's expert Dr. Koliwad was equivocal about whether Plaintiff suffered from ketoacidosis: "I think it's completely reasonable to conclude that that *might* have happened to him at any point during that period before the mealtime insulin was sufficiently added back." *Id.* at 472:19-25 (emphasis added). Accordingly, given the documentary evidence of Plaintiff's

normal vital signs contrasted with Plaintiff's self-serving assertion that he "diagnosed" himself with ketoacidosis, and the conflicting expert testimony, the jury could reasonably have found that Plaintiff was not harmed.

Accordingly, Plaintiff has not shown that the jury's verdict on Plaintiff's claim against Defendant Ahmed was contrary to the clear weight of the evidence.

### C. Plaintiff Has Not Shown That Dr. Fitzgerald's Testimony Was Inadmissible

Next, Plaintiff contends that the Court should have excluded the testimony of Defendants' expert Dr. Fitzgerald, and that the Court's failure to do so requires the Court to amend the judgment. Plaintiff does not assert that Dr. Fitzgerald's testimony is grounds for a new trial. *See generally* New Trial Mot.

Plaintiff argues that Dr. Fitzgerald's testimony violated Federal Rule of Evidence 702, which governs the admission of expert testimony, because Dr. Fitzgerald confused Type 1 and Type 2 diabetes: "By using type-two data, he confused the jury and showed great failures on Plaintiff's claim." Mot. to Amend at 3. Specifically, Plaintiff appears to contend that Dr. Fitzgerald's testimony that diet is important for a Type 1 diabetic applies only to Type 2 diabetes: "The idea to use collusion, violates FRCP #702 [sic] and testimony of such things as a 'food-list' or 'body weight," do not apply." *Id.* at 4. Dr. Fitzgerald testified that Plaintiff's diet may have affected Plaintiff's blood sugar readings: "Well, it's – diet is very important in, in both Type 1 and Type 2 diabetes, and we – don't let anyone tell you different. It's very important. If someone eats a good diabetes diet, which is fairly low in carbohydrates, it'll keep their blood sugar from going up excessively into the 3- and 400 milligrams per deciliter." *Id.* at 530:7-12.

However, Plaintiff offers no support for his argument that permitting Dr. Fitzgerald's testimony was clear error. For one, when Defendants tendered Dr. Fitzgerald as an expert, Plaintiff—who was ably represented by counsel from the law firm of Arnold & Porter—did not object. *See* Tr. at 516:8-13 (Plaintiff's counsel not objecting to Dr. Fitzgerald's tender "as an expert in the field of endocrinology and diabetes treatment"). Indeed, Dr. Fitzgerald testified that

United States District Court
Northern District of California

he has an active practice treating patients with diabetes at the University of California, San Francisco, and that he has "seen over 1,000 patients in my career with Type 1 diabetes." *Id.* at 515:18-516:4. Further, consistent with the testimony of Plaintiff's own expert, Dr. Fitzgerald distinguished Type 1 and Type 2 diabetes. Dr. Fitzgerald described Type 1 as an insulin deficiency disease and Type 2 as an insulin resistance disease. *Id.* at 524:4-18; *see id.* at 435:5-436:7 (Dr. Koliwad stating that Type 1 diabetics "don't make insulin" and describing Type 2 diabetes as "insulin resistance").

Plaintiff only disputes Dr. Fitzgerald's testimony on the importance of diet and a food list for a Type 1 diabetic. Yet Plaintiff's counsel had an opportunity to cross-examine Dr. Fitzgerald on this point, but did not—a decision Plaintiff excuses by claiming that "Plaintiff asked counsel to cross on these points, but Dr. Fitzgerald would only duplicate his false claims." Mot. to Amend at 4. Rather, Plaintiff's counsel may have chosen not to cross-examine Dr. Fitzgerald on the importance of diet for a Type 1 diabetic because the issue is ancillary to the liability question in this case: whether Defendant Ahmed's May 23, 2013 *insulin regimen change* constituted deliberate indifference to Plaintiff's serious medical needs.

Plaintiff also offers no evidence that Dr. Fitzgerald's testimony was incorrect, other than Plaintiff's own post-trial declarations that Plaintiff seeks to offer as expert testimony. In the December 31, 2018 "addendum" to Plaintiff's post-trial motions, Plaintiff states that Plaintiff is qualified as an expert in the treatment of diabetes:

> With minimal resources, the plaintiff will submit multiple declarations on topics that expert Fitzgerald spoke on. Though a plaintiff, David S. Peasley, has forty-seven years of experience (47), has witnessed and lived by unthinkable situations, and has taught countless fellow diabetics, so Rule #702(a)(b) both apply and could be an 'expert' himself. Plaintiff Peasley does not lie, so please consider what a type-one diabetic must do below.

ECF No. 342 at 3. Plaintiff then offers a series of "declarations" in which Plaintiff continues to argue that Dr. Fitzgerald's opinions were incorrect. *See id.* at 4-17. However, Plaintiff is not a medical doctor, and Plaintiff's own experience as a Type 1 diabetic does not qualify him to

United States District Court
Northern District of California

provide expert testimony on how diet might affect a Type 1 or Type 2 diabetic's blood sugar levels. *See Lane v. D.C.*, 887 F.3d 480, 485 (D.C. Cir. 2018) ("A trial court does not err by excluding evidence of a medical condition from a lay witness."); *Texter v. Merlina*, 333 F. App'x 680, 682 (3d Cir. 2009) (affirming exclusion of lay testimony about plaintiff's injuries "which would require a medical expert"). Nor was Plaintiff disclosed to Defendants as an expert before trial, as required by Federal Rule of Civil Procedure 26. Therefore, the Court strikes the purported expert declarations in Plaintiff's addendum as improper lay opinion testimony.

Accordingly, Plaintiff has not shown that the Court committed clear error in permitting Dr. Fitzgerald to testify at trial, when Plaintiff did not object to Dr. Fitzgerald's certification as an expert, Plaintiff's counsel did not cross-examine Dr. Fitzgerald on the alleged errors in his testimony, and Plaintiff's only contrary evidence are Plaintiff's self-serving, inadmissible post-trial declarations.

### D. The Jury's Verdict on Plaintiff's Eighth Amendment Claim Against Defendant Lopez is Not Contrary to the Clear Weight of the Evidence

Lastly, Plaintiff brings a conclusory challenge to the jury's verdict for Defendant Lopez. Plaintiff argues "time after time both Defendants are shown by case law to be guilty of deliberate indifference." Mot. to Amend at 6. Plaintiff also argues that Defendant Lopez "has been found to restrict people to a cell" and that "she is aware a diabetic could have a medical need and simply said 'no.'" New Trial Mot. at 3.

However, the jury's verdict in favor of Defendant Lopez is supported by the evidence. Although Plaintiff testified that Defendant Lopez refused Plaintiff's request to eat dinner after his insulin shot, Tr. at 208:24-209:2, Defendant Lopez testified that she could not recall any such event. *Id.* at 265:12-15 ("Q: Mr. Peasley also testified that you told him he could eat crackers instead of going to dinner. Do you recall telling him that? A: No, I don't."). Moreover, on the evening of November 4, 2013, Plaintiff's blood sugar was measured at 258 mg/dl. Ex. 408. Defendants' expert Dr. Fitzgerald testified that if Plaintiff had in fact missed a meal, Plaintiff's blood sugar should have been much lower: "And, you know, if Mr. Peasley had received his usual

32

insulin there on November 4 at dinner and then not eaten at all, his blood sugar would have been lower. So he – he obviously ate." Tr. at 563:15-18. Accordingly, the jury could reasonably have concluded that Defendant Lopez did not refuse to let Plaintiff eat.

Even if Defendant Lopez refused to let Plaintiff eat, the evidence supports a finding that Plaintiff was not harmed. Plaintiff testified that he ate crackers, wanted a real meal, and was hungry and irritated on the evening of November 4, 2013: "There was a – hungry for a real meal. I wasn't real happy everybody in the whole building got to eat." *Id.* at 211:15-17. Further, when asked whether he requested medical care on November 4, 2013, Plaintiff testified that he did not: "I requested food. No." *Id.* at 256:9-11. Accordingly, the evidence supports a finding that Plaintiff was not harmed. *See McGuckin*, 974 F.2d at 1060 (holding that a plaintiff must show harm to prevail on a deliberate indifference claim).

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motions to amend or alter judgment, for reconsideration, and for a new trial.

**IT IS SO ORDERED.**

Dated: June 28, 2019

_Lucy H. Koh_
LUCY H. KOH
United States District Judge

United States District Court
Northern District of California

33

Case No. 15-CV-01769-LHK
ORDER DENYING PLAINTIFF'S MOTION TO AMEND OR ALTER JUDGMENT; MOTION FOR RECONSIDERATION; AND MOTION FOR A NEW TRIAL